**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| MOBILITY WORKX, LLC,<br><br>         *Plaintiff*,<br>v.<br><br>AT&T INC., et al.,<br><br>         *Defendants*. | Civil Action No. 4:23-cv-00594-ALM<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF MOBILITY'S OPENING CLAIM CONSTRUCTION BRIEF

## <u>EXHIBITS</u>

Ex. 1: U.S. Patent No. 7,697,508 ("'508 Patent")

Ex. 2: U.S. Patent No. 8,213,417 ("'417 Patent")

Ex. 2A: IPR2018-01150 Final Written Decision. ("'417 IPR FD")

Ex. 3: U.S. Patent No. 7,231,330 ("'330 Patent")

Ex. 4: Declaration of Professor Abdelsalam A. Helal ("Helal")

Ex. 5: Declaration of Dr. Edwin A. Hernandez ("Hernandez")

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION ......................................................................................1

II.   THE '508 AND '417 PATENTS ...............................................................1

      A.    Overview ........................................................................................1

      B.    Disputed terms and phrases ...........................................................3

            1.    "a ghost mobile node" ('508 claims 7, 8, 11-15; '417 claims 1, 3, 6) .........3

            2.    "the ghost-foreign agent" ('508 claim 14; '417 claims 1, 6) ......................3

            3.    "geographical current state" ('508 claims 7, 14) ..........................................4

            4.    "[predicted] geographical future state(s)" ('508 claims 7, 14) ...................5

            5.    "correspondent node" ('508 claims 11, 17) ..................................................5

            6.    "when the mobile node is located in a geographical area where the foreign agent is not physically present" ('417 claim 1) ..........................................6

            7.    "tunnel" ('417 claim 3) .................................................................................7

            8.    "wherein signaling further comprises at least one of a tunnel and a communication network" ('417 claim 3).....................................................9

            9.    "care-of address" ('417 claim 6).................................................................10

            10.   "mobile IP advertisement messages" ('417 claim 6)................................11

III.  THE '330 PATENT ..................................................................................12

      A.    Overview ......................................................................................12

      B.    Disputed terms and phrases .........................................................13

            11.   "wireless" (claims 1-19) .............................................................................13

            12.   "wireless network nodes"/"wireless nodes" (claims 1, 2, 5, 9, 11, 14-16) 15

            13.   "emulator" (claims 1, 2, 5, 11, 16)............................................................15

14.   "emulating"/"emulate"/"emulated"/"emulates" (claims 1, 2, 8, 11, 17, 19) ....................................................................................................................16

15.   "mobile node configured to wirelessly communicate" / "mobile node wirelessly communicates" (claims 1, 11) ...................................17

16.   "a packet-based wired communications network" (claims 1, 11)..............18

17.   "wireless communication conditions" (claims 1, 11) ...............................18

18.   "home agent" (claims 2, 11, 16) ...............................................................19

19.   "wireless access point" (claims 5, 6, 14) ..................................................19

20.   "attenuator"/"attenuation" (claims 5-8, 14, 17-19)...................................20

21.   "antenna" (claims 5, 10, 14) .....................................................................20

22.   "variable attenuator comprises a plurality of variable attenuators" (claim 7) ..............................................................................................................21

IV.   CONCLUSION..........................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

*Mobility Workx, LLC v. Cellco Partnership d/b/a Verizon Wireless, et al.*, No. 4:17-CV-872 (E.D. Tex. Mar. 15, 2019) .................................................................................................... *passim*

*Mobility Workx, LLC v. T-Mobile US, Inc. et al.*, No. 4:17-CV-567 (E.D. Tex. July 31, 2018) ................................................................................................................. *passim*

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ......................................................9

*Sonix Technology Co. v. Publications International, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017)..........9

*University of Florida Research Foundation, Inc. et al. v. Motorola Mobility LLC*, No. 13-cv-61120-KMM (S.D. Fla. Feb. 19, 2014) ("*Motorola*") .............................................. *passim*

## I.      INTRODUCTION

Plaintiff Mobility accuses Defendants of infringing three patents: United States Patents Nos. 7,697,508 ("the '508 Patent"), 8,213,417 ("the '417 Patent"), and 7,231,330 ("the '330 Patent") (collectively, "the patents-in-suit"). The '417 Patent is a continuation of the '508 Patent. Thus, these two patents share both a common specification and some claim terms. As such, claim construction issues relating to the '508 and '417 Patents are discussed jointly below. Claim construction issues relating to the '330 Patent are discussed separately.

A few years ago, this Court construed terms in the patents-in-suit in *Mobility Workx, LLC v. T-Mobile US, Inc. et al.*, No. 4:17-CV-567 (E.D. Tex. July 31, 2018) ("*T-Mobile*") and *Mobility Workx, LLC v. Cellco Partnership d/b/a Verizon Wireless, et al.*, No. 4:17-CV-872 (E.D. Tex. Mar. 15, 2019) ("*Verizon*"). Over a decade ago, the Southern District of Florida construed terms in the '330 Patent in *University of Florida Research Foundation, Inc. et al. v. Motorola Mobility LLC*, No. 13-cv-61120-KMM (S.D. Fla. Feb. 19, 2014) ("*Motorola*").

## II.     THE '508 AND '417 PATENTS

### A.      Overview

The connection process in traditional mobile networks begins with a signal from the mobile node (e.g., smart phone) that wishes to connect to the network. This signal initiates a connection process, which may include the negotiation of protocol details, communication rates, and error-handling approaches. The connection process results in the registration of the mobile node with the network. At this point, the network may allocate resources for the communication session with the mobile node. The '508 and '417 Patents add the concepts of a ghost mobile node and a ghost foreign agent to the existing mobile networks. These entities are virtual nodes that act to represent their respective network nodes. The ghost mobile node sends a signal to the network, in advance of the mobile node's arrival, so that the registration process can be complete, once the mobile node

is ready to connect. In this way, the ghost mobile node sends a signal to a foreign agent, which causes the registration of the mobile node and the eventual allocation of resources by the network. All of this is completed in time for the mobile node's actual arrival, reducing or eliminating the latency associated with the process.

Generally speaking, the '508 and '417 Patents teach, among other things, a system for proactive allocation of resources in a wireless communications network. This novel system provides various advantages and benefits. For example, it leads to reduced delays and information losses in wireless communication networks by reducing registration overhead and setup times associated with mobile node handoffs. These advantageous results, among others, are achieved by allocating communication network resources proactively rather than reactively.

The '508 and '417 Patents present the problem to be addressed:

> Conventional techniques typically require that the mobile node 250 be in the physical region covered by a particular foreign agent 215, 230 in order for the handoff to occur. The processing and updating of relevant information that accompanies the handoff thus exacts a time delay before the mobile node 250 is able to begin communication with the interconnection of networks 200 through the foreign agent of the region in which the mobile node has newly arrived. During the time delay, moreover, any datagrams that arrive from a correspondent node will be dropped because of the temporary lack of a communication link with the mobile node 250. '508 Patent (6:3-14).

The '508 and '417 Patents also propose various solutions. For example:

> The present invention provides a preemptive and predictive solution for communications in wireless communications networks. More particularly, the present invention provides two different types of ghost-entities that can be used individually or jointly in setting up a wireless connection between a mobile node and a foreign agent. The ghost entities can act on behalf of a wireless node and a foreign agent. They can determine and use predicted information to improve the performance of wireless communications, especially those involving a mobile node moving at moderate or high speeds. As explained herein, the ghost entities cause communication network resources to be allocated proactively rather than reactively. '508 Patent (2:42-54).

The claims of the '508 and '417 Patents are directed to the solutions to these problems.

**B.    Disputed terms and phrases**

**1.    "a ghost mobile node" ('508 claims 7, 8, 11-15; '417 claims 1, 3, 6)**

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a node, or a virtual node, that can operate on behalf of the mobile node" | "a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent" |

The Court previously construed this term and Defendants propose the Court adopt the same construction again. *T-Mobile* at 7-14. Mobility, however, respectfully disagrees with the Court's finding then that "[t]hus, on balance, the patentee definitively stated that, '[t]he ghost mobile node is capable of registering and allocating communication resources before the mobile node physically arrives in a geographic state.'" *Id*. at 13. Mobility does not wish to rehash the arguments made previously, but rather merely wishes to note its objection to preserve the right to seek review.

**2.    "the ghost-foreign agent" ('508 claim 14; '417 claims 1, 6)**

| Mobility's Proposed Construction[1] | Defendants' Proposed Construction |
|---|---|
| "a node, or a virtual node, corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" | "a virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" |

The Court previously construed this term and Defendants propose the Court adopt the same construction again. *T-Mobile* at 17-20. Mobility agrees with most of the Court's construction but proposes one slight change. As the Court noted in *T-Mobile*, "the parties agree that a 'ghost-foreign agent' can be 'virtual.'" *Id*. at 18. Thus, a "ghost-foreign agent" does not have to be virtual, as

---

[1] In the Joint Claim Construction and Prehearing Statement, Mobility's proposed construction of this term did not include the "proximate to the predicted future location of the mobile node" language. Mobility wishes to hereby amend its proposed construction to include that language.

defendants propose. Rather, as Mobility proposes, a "ghost-foreign agent" can be "a node, or a virtual node." This also aligns with the construction of "a ghost mobile node" that is "a node, or a virtual node." This issue was not raised or addressed by the Court previously.

### 3. "geographical current state" ('508 claims 7, 14)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "coverage area of an agent through which the mobile node is linked to the network at its current location" |

The Court construed this term as per agreement between Mobility and T-Mobile, *T-Mobile* at 20-21, and that is the construction proposed by Defendants here. Mobility does not agree to the construction here because the limitation to "coverage area" unjustifiably narrows the claim term by excluding other possible geographical status information.

As explained by Professor Helal and Dr. Hernandez, the term "geographical current state" means "state relevant to the current geographical location, including the location itself but not limited to only location or coverage area," Helal at 4, and "geographical state information can include any information relating to location, such as an eNB ID, Tracking Area ID, Cell ID, or latitude and longitude of an eNB antenna." Hernandez at 8. Further, "[a] node's geographical current state in the context of 4G and 5G networks includes the current coverage area of the node, the identity of the eNodeB to which the node is connected, the Tracking Area ID in which the mobile node is located, and/or the specific Cell ID in which the mobile node is more specifically located in a coverage area. The geographical current state also includes the latitude and longitude information of the eNodeB (specifically its antenna). Information included in the geographical current state also includes the Neighbor Relation Table." Helal at 4-5.

### 4.    "[predicted] geographical future state(s)" ('508 claims 7, 14)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "coverage area, within a wireless communications network, in which the mobile node is predicted to be able to be linked to the wireless communication network at a time in the future" |

The Court previously construed this term and Defendants propose the Court adopt the same construction again. *T-Mobile* at 22-25. Mobility, however, respectfully disagrees, for the same reasons as explained immediately above that it disagrees with limiting geographical current state to a coverage area. Rather, "a predicted geographical future state may include a predicted future location but may also include predicted location related information such as eNB ID, Tracking Area ID, Cell ID, or latitude and longitude of an eNB antenna." Hernandez at 9. Thus, "geographical future state" should not be limited to just a "coverage area".

### 5.    "correspondent node" ('508 claims 11, 17)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a node, other than the home agent, in a home network capable of receiving communications from other network nodes" |

This term has not been construed previously. The '508 patent's specification states:

> The home agent 205 is a network node belonging to the network that is designated as the home network. The network is a home network in the sense that it serves as a virtual permanent residence at which the mobile node 250 can receive communications from other network nodes, designated as **correspondent nodes**. '508 Patent (5:9-14) (emphasis added).

Defendants' proposed construction impermissibly limits "correspondent nodes" to nodes that are "in a home network," but this is not required by the intrinsic evidence. While a "correspondent node" can be "in a home network", it does not have to be. As Professor Helal explains:

> I understand the term "correspondent node" ('508 claims 11, 17) to mean any peer node with which the mobile node communicates while away from its home

> network. It's typically any node on the Internet (and not only in the home network) that exchanges data with the mobile node (not just receiving communication). The correspondent node is unaware of the mobile node's mobility and interacts with it through its home address. My understanding of "corresponding node" is identical to its definition in both IPV4 and Mobile IPV6. For example, in RFC 6275 titled "Mobility Support in IPv6", which defines Mobile IPv6, the term "correspondent node" is used throughout the document to refer to a peer node with which the mobile node communicates.

Helal at 5.

Further, Defendants' proposed construction is also impermissibly narrowing in that it requires correspondent nodes to be "capable of receiving communications," but nothing in the specification or prosecution history supports such a limitation. Indeed, the plain language cited above states that correspondent nodes are "other network nodes" from which a home agent "can receive communications." Thus, correspondent nodes are not required to receive communications, as they are actually taught to be capable of sending communications that home agents receive.

This conclusion is bolstered by the claim language, which states, "The wireless node pair as defined in claim 7, wherein the ghost-mobile node buffers communications communicated to the mobile node from a correspondent node of the communications network." '508 Patent, Clm. 11. As stated in the claim, a correspondent node communicates communications to a mobile node.

### 6. "when the mobile node is located in a geographical area where the foreign agent is not physically present" ('417 claim 1)

| Mobility's Proposed Construction[2] | Defendants' Proposed Construction |
|---|---|
| Same as Defendants | "when the mobile node is located outside of the region covered by the foreign agent" |

The Court construed this term as per agreement between Mobility and T-Mobile, *T-Mobile* at 29-31, and that is the construction proposed by Defendants and agreed to by Mobility here.

---

[2] In the Joint Claim Construction and Prehearing Statement, Mobility's proposed construction of this term was plain and ordinary meaning. Mobility amends its proposed construction to that proposed by Defendants.

### 7.    "tunnel" ('417 claim 3)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a data path for transmitting data intended for use only within a private network through a public network such that the public routing nodes are unaware that the transmission is part of a private network" |

This term has not been construed previously. The '417 patent specification states:

The ghost-mobile node 220 can replicate the registration request, handle the creation of **tunnels**, and replicate authentication and authorization information from the mobile node 250, thus acting on behalf of the mobile node 250 before the mobile node is in range of a next foreign agent 215, 230. '417 Patent (10:1-6) (emphasis added).

The home agent 205 can initiate **a tunnel** to the foreign agent 210 and transmit a registration reply. The foreign agent 210 can create **a tunnel** to the foreign agent 215, defining a leaf foreign agent, and forward the registration reply to the foreign agent. ... Accordingly, the foreign agent 215 can open **a tunnel** to the next foreign agent 230 and send a registration reply. '417 Patent (10:41-57) (emphasis added).

The specification thus adopts the plain and ordinary meaning of the term "tunnel," i.e. "a point-to-point connection established between two endpoints over a public or private network (trusted or untrusted), such as the Internet," Helal at 5, or "a communication pathway between two devices or networks over an existing communication network enabling the transfer of data as if they were directly connected," Hernandez at 9.

As Professor Helal explains:

Tunnels encapsulate the original data packets within new packets, allowing them to traverse networks that may not support the original protocol, have security concerns, or that may not know how to route and forward the original data packets. Tunnels are commonly used to create secure connections between remote networks (private or public) or to extend a private network across a public network, such as connecting branch offices to a corporate network securely over the Internet. Tunnels are also used between two endpoints, when the last-hop routing of the original packet sent by one endpoint (sender endpoint) to its intended final destination (mobile node) can be determined only by the other endpoint (receiving endpoint). In this latter case, which is relevant to claim 3 in '417, the foreign agent (the receiving endpoint) knows how to perform the last-hop routing of an original

packet sent by a correspondent node (sender endpoint) to a mobile node (the intended final destination). It knows how because that is its role and purpose. Defendant's proposed construction as worded is limiting to only serving private connections of a private network over a public or unsecure network. This is an incomplete construction as tunnels do more than just that. As shown above there are more reasons why a tunnel is used including because only the receiving endpoint has the knowledge on how to route the original packet to its intended final destination. Hence, defendant's construction should be declined and the plain and ordinary meaning of tunnel, which is broader, should be used.

Helal at 5-6.

Further, as Dr. Hernandez explains:

An IP Tunnel has nothing to do with whether it is being used on a private network or public network, even though tunnels allow remote networks to appear to be locally connected. …

The tunnels described by the '508 and '417 patents' specifications are related to packet encapsulation and are not dependent on private and public networks as defendant erroneously limits the use of private IP addresses (192.168.* and 10.*) and public routable addresses, which is incorrect as public IP Addresses can be encapsulated into private IP Addresses, as well as public on public, and private on private.

Hernandez at 9-10.

Defendants' proposed construction comes from a different part of the specification that discusses the act of tunnelling, not tunnels, which states:

[T]unneling refers to the transmission of data intended for use only within a private, such as a corporate, network through a public network wherein the transmission is performed in such a way that the routing nodes in the public network are unaware that the transmission is part of a private network. Tunneling is generally performed by encapsulating the private network data and protocol information within the public network transmission units so that the private network protocol information appears to the public network as data. Tunneling allows the use of the Internet, which is a public network, to convey data on behalf of a private network. Common examples of tunneling techniques can include, but are not limited to, Point-to-Point Tunneling Protocol (PPTP) and generic routing encapsulation (GRE). Still, any of a variety of different tunneling techniques can be used. '417 Patent, (5:55-6:2).

Defendants' proposed definition limiting "tunnels" to only "data intended for use only within a private network" incorrectly narrows the definition of the term to only one type of tunnel, which

is not commensurate with the scope of the term tunnel in the specification, such as in the portions cited initially above that describe foreign agents creating tunnels to next foreign agents, something that occurs on public networks. '417 Patent (10:41-57).

> **8.** **"wherein signaling further comprises at least one of a tunnel and a communication network" ('417 claim 3)**

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term has not been construed previously. Claims are only indefinite if they, when "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Technology Co. v. Publications International, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention. One of skill would recognize this phrase contains a typographical error and interpret it to mean "wherein signaling further comprises at least one tunnel and at least one communication network," because "a POSITA would have known that a tunnel can exist in a communication network, and signals are exchanged as IP packets." Hernandez at 10. Further, regarding the relationship between "tunnel" and "communication network," one of skill would have known that "a tunnel exists with a communication network, but a communication network can exist on its own without a tunnel." *Id*.

Additionally, while not binding on the Court, the Patent Trial and Appeal Board, in an Inter Partes Review of the '417 Patent, did not find that the phrase "wherein signaling further comprises at least one of a tunnel and a communication network" was indefinite. Indeed, the PTAB

specifically held that, "we are not persuaded the claim language is ambiguous or lacks antecedent basis." '417 IPR FD at 38.

### 9. "care-of address" ('417 claim 6)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "an IP address that changes as the mobile node moves between networks" |

This term has not been construed previously. The Background section of '417 patent's specification states, "The care-of address changes as the mobile node moves between networks thereby changing its point of attachment to a network." '417 Patent (1:47-49). This is the basis of Defendants' proposed construction. However, the Detailed Description of the Invention section, the specification states:

> A foreign agent 210, 215, 230 typically includes in an advertisement message the vector of **care-of addresses**. As noted above, the vector of **care-of addresses** provide an IP address for each of the foreign agents ancestors, as well as the foreign agents own IP address. '417 Patent (10:30-34) (emphasis added).

> The home address and **care-of-address** are generally known, since the decapsulation process takes place at the foreign agent. For example, the care-of address matches the foreign agent address. '417 Patent (11:35-38) (emphasis added).

Neither of these passages requires that the care-of-address change as the mobile node moves between networks, as Defendants suggest, even though such change is possible. Rather, as set forth in this specification language regarding the Invention, as opposed to the Background, a care-of-address can be an IP address of a foreign agent or a foreign agent ancestor. '417 Patent (10:30-34).

As shown in FIG 4 (reproduced below), and discussed at 11:67-12:5, "care of addresses are already a persistent part of the foreign agent configuration file," and might persist or change.

10



**FIG. 4**

Hernandez at 12.

A care-of-address may change as the mobile node moves even if not moving between networks. Hernandez at 11-12. Defendant's proposed construction that a care-of-address does not change unless it moves "between networks" is limiting in a way unsupported by the intrinsic evidence.

### 10.    "mobile IP advertisement messages" ('417 claim 6)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

This term has not been construed previously. The '417 Patent's background section states:

> In accordance with a typical mobile networking protocol, a mobile node registers with a home agent so that the home agent can remain a contact point for other nodes that wish to **exchange messages or otherwise communicate** with the mobile node as it moves from one location to another. An example of such a protocol is Mobile Internet Protocol (Mobile IP). **Mobile IP allows a mobile node to use two IP addresses, one being a fixed home address and the other being a care-of address**. '417 Patent (1:45-47) (emphasis added).

The Detailed Description of the Invention then explains:

> A ghost-foreign agent 225, 240 transmits **an advertisement** notifying the mobile node 250 of the existence of a next foreign agent 230, transmitting **the advertisement** from a foreign agent 215 currently connected with the mobile node 250. That is, the ghost-foreign agent 225 **advertises** a first foreign agent 230 but

does so using a second foreign agent 215. Thus, **the advertisement** of foreign agent 230 by its ghost-foreign agent 225 is able to reach the mobile node 250 while the mobile node is in the predefined region covered by foreign agent 215. Therefore, the ghost-foreign agent 225 makes the mobile node aware of the foreign agent 230 before it arrives in the predefined region covered by the foreign agent.

A foreign agent 210, 215, 230 typically includes in **an advertisement message** the vector of care-of addresses. As noted above, **the vector of care-of addresses provide an IP address for each of the foreign agents ancestors, as well as the foreign agents own IP address**. '417 Patent (10:17-34) (emphasis added).

Thus, the specification describes that an "advertisement" is merely a "message" that typically include IP addresses for foreign agents. This is also the plain and ordinary meaning of this phrase. Hernandez at 12-13 ("'mobile IP advertisement messages' corresponds to the ICMP Standard"). Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention.

Further, while not binding on the Court, the Patent Trial and Appeal Board, in an Inter Partes Review of the '417 Patent, did not find that the term "mobile IP advertisement messages" was indefinite. Indeed, the PTAB found that the asserted prior art failed to teach precisely that limitation. '417 IPR FD at 33-34 ("Petitioner has not demonstrated by a preponderance of the evidence that the subject matter of claim 6 would have been obvious over Liu and Gwon.").

## III.    THE '330 PATENT

### A.    Overview

The '330 Patent also brought innovative solutions to the world of high-speed mobility, which, while bringing numerous benefits and advantages, also introduced new problems and challenges and raised new questions, such as: How is such a high-speed environment adequately modeled? The '330 Patent answers this question by teaching, among other things, a system and method for emulating mobile network communications. These novel systems and methods provide various advantages and benefits, such as the modeling and testing of various mobile network

configurations and scenarios. These advantageous results, among others, are achieved by dynamically adjusting the signal reception sensitivity and signal transmission strength of each wireless node and by emulating at least one wireless network node attribute to simulate network conditions experienced by the mobile node in communicating with network-connected nodes.

**B.    Disputed terms and phrases**

**11.    "wireless" (claims 1-19)**

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "without wires or cables, and only through air or vacuum" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 3-4. Mobility also previously agreed to the construction in Verizon. *Verizon* at 7. However, Mobility believes that the construction is critically flawed because "wireless" is an adjective that can have different meanings based on what term it is modifying. For example, a "wireless network" as described by the '330 patent is not one that is completely without wires or cables, rather "wireless networks" rely on many wires and cables to operate. There is no such thing as a "wireless" wireless network under Defendant's proposed construction.

The '330 Patent is also directed to and claims emulating wireless networks. The Background discusses how emulation of wireless networks can be performed through software and wire-line emulators. '330 Patent (1:59-60). The Summary of the Invention section states:

> [E]ach of **the wireless nodes can include a wireless access point** having an antenna and a variable attenuator. The wireless nodes further can include a routing device. The wireless nodes can be communicatively linked with the home agent through a network emulator. '330 Patent (3:22-26) (emphasis added).

This passage shows that a "wireless node" can, but need not, have a wireless access point. In fact, the "wireless nodes" can include a routing device connected by wires, not "without wires or cables, and only through air or vacuum." Fig. 1, copied below, shows the invention's "wireless network



FIG. 1

nodes" contain wired access points and routers and are connected to emulators by wire. This contradicts Defendants proposed construction that "wireless" means completely without wires.

Further, a "wireless" signal is merely one with a particular radio frequency and can be emulated in a wired system as taught and claimed by the '330 patent. '330 Patent (2:25-28, 40-43) ("Motion of the mobile node can be simulated by dynamically adjusting the signal reception sensitivity and signal transmission strength of each wireless node. … The wireless communication characteristics can include signal reception sensitivity and signal transmission strength of the wireless nodes."). In sum, Defendants' construction of "wireless" to mean having no wires or cables is contrary to the intrinsic evidence.

### 12. "wireless network nodes"/"wireless nodes" (claims 1, 2, 5, 9, 11, 14-16)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "an element of a wireless network that sends and receives signals" | "an element of a network that sends and receives signals wirelessly" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 5-6. Mobility also previously agreed to the construction in Verizon. *Verizon* at 7. However, Mobility believes that the word wireless modifies the word "element" and not the words "sends and receives." As discussed immediately above, the '330 Patent plainly shows, such as in Fig. 1, that "wireless network nodes" can send and receive signals via wires, and do not always exclusively send and receive signals wirelessly.

Indeed, "[t]he wireless nodes can be communicatively linked with the home agent through a network emulator," '330 Patent (3:22-26), where "communicatively linked" includes being connected by wires as shown in Fig. 1. The intrinsic evidence does not support Defendants' proposal that wireless nodes must send and receive signals wirelessly and only wirelessly.

### 13. "emulator" (claims 1, 2, 5, 11, 16)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a system or device (either hardware, software, or both) that imitates, models or simulates the conditions, acts or functions of a real-world event, system device, or condition" |

This term has not been construed previously. The Summary of the Invention section of the '330 Patent states, "The network emulator can be configured to replicate attributes of a wired communications network." '330 Patent (2:43-45). The Detailed Description of the Invention states, "The emulator 110 can be a hardware or a software network emulator." '330 Patent (5:40-41). As shown in FIG 1 below, the emulator 110 acts on the wired network and emulates the conditions of the wired communication network.



FIG. 1

One of skill in the art at the time of the invention would have understood the plain and ordinary meaning of the word emulator to match these descriptions. Hernandez at 13-14. Thus, there is no basis to adopt Defendants' proposed construction of this term.

> **14.** **"emulating"/"emulate"/"emulated"/"emulates" (claims 1, 2, 8, 11, 17, 19)**

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "the act of imitating, modeling or simulating the conditions, acts or functions of a real-world event, system, device, or condition" |

This term has not been construed previously. For the same reasons as discussed above with respect to "emulator", there is no reason to adopt a construction of these terms. Rather, they are all merely steps or functions performed by an emulator. Hernandez at 14-15.

Defendants' proposed construction is also ambiguous in that the terms imitating, modeling, and simulating are no more certain than the term emulating and there is no basis in the intrinsic record to trade one word ("emulating") for three other words ("imitating", "modeling", or "simulating"). The ambiguity introduced by using the three words with the conjunction "or" between them should be avoided.

### 15. "mobile node configured to wirelessly communicate" / "mobile node wirelessly communicates" (claims 1, 11)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a device that can send and receive wireless signals" | "a device that sends and receives signals wirelessly" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 5. Mobility also previously agreed to the construction in Verizon. *Verizon* at 7. However, the construction should be slightly modified to clarify that the term "wireless" modifies the word signals and not the words "sends and receives." This is because, as discussed above, the '330 Patent is directed to emulating – not replicating – wireless networks. As Professor Helal explains:

> When a device is configured to wirelessly communicate, it sends and receives wireless signal (as construed by the Plaintiff). Specifically, it transmits and receives electromagnetic signals through the air (or other medium). Sending and receiving signals wirelessly, on the other hand, is a broader concept encompassing the wireless exchange of information between devices, which may involve both sending and receiving wireless signals as part of the communication process. For instance, the signal may not be wireless at all (for instance an audio output signal or an MPEG 2000 signal that represent a compressed video) but sending and receiving such non-wireless signal wirelessly may involve forwarding such nonwireless signals back and forth through a wireless communication system.

Helal at 6-7. Thus, when emulating wireless networks, mobile nodes can be used that are configured to wirelessly communicate or that wirelessly communicate, but that are in fact not sending and receiving signals wirelessly, even if those signals are wireless signals.

### 16.    "a packet-based wired communications network" (claims 1, 11)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a communications network in which IP packets of data are transmitted through wires or cables" | "a communications network in which packets of data are transmitted through wires or cables" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 6-7. Mobility also previously agreed to the construction in Verizon. *Verizon* at 7. However, Mobility believes that one slight modification should be made to clarify the scope of the claim, namely that the "packets of data" are "IP packets of data."

The Detailed Description of the Invention states:

> While Mobile IP and Home agent were used as examples, those skilled in the art will recognize that the inventive arrangements disclosed herein can be used to emulate any Layer 2 or 3 Mobility protocol including, but not limited to Mobile IP, Mobile IP v. 6, Cellular-IP, and the like. '330 Patent (10:3-7).

"Mobile IP, Mobile IP v. 6, Cellular-IP, and the like" all use IP packets of data. As Professor Helal explains:

> At the time of invention, a POSITA would recognize that the packet data referred to in the '330 specifications (for instance, '330, 10:3-7), must be an IP packet data communication network. While at the time of invention, there existed other packet-like networking architectures (e.g., Asynchronous Transfer Mode (ATM), X.25, FrameRelay, DecNet, and Token Ring), such network architectures were an extreme and diminishing minority. Further, none of such network architectures supported mobility. Only IP networks supported mobility by creating extensions such as Mobile IP, Mobile IP V6, and Cellular-IP.

*Id*. Thus, the packets of data in the '330 Patent are all IP packets of data. The construction of this term should reflect that fact in order to avoid potential debates about this term in the future.

### 17.    "wireless communication conditions" (claims 1, 11)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term has not been construed previously. The specification states:

The emulator 110 can simulate various **conditions** of an attached wired network. By varying the amount of attenuation provided by each attenuator 145 and the rate at which the attenuation either increases and/or decrease in each respective network node 105, **the controller 120 emulates motion of the mobile node 125 for any of a variety of different trajectories, speeds, and/or accelerations**. '330 Patent (6:59-65) (emphasis added).

As noted, by varying the rate and amount of attenuation of one or more of the attenuators, **different characteristics of motion such as the trajectory, speed, and/or acceleration of the mobile node can be emulated**. '330 Patent (7:55-59) (emphasis added).

Thus, the '330 patent provides examples of wireless communication conditions, including trajectory, speed, and/or acceleration. Defendants cannot prove with clear and convincing evidence that this phrase fails to inform one of skill in the art of the scope of the invention.

### 18.    "home agent" (claims 2, 11, 16)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a device (or program) that maintains information about a mobile device's current location" |

This term has not been construed previously. The specification of the '330 Patent states:

The **home agent** 115 can be a computing environment with which the mobile node 125 can communicate via the wireless and wired portions of system 100. For example, the **home agent** 115 can be one or more application programs which the mobile node 125 can access, a virtual private network (VPN) configuration, virtual environment, or the like. '330 Patent (6:3-9) (emphasis added).

Defendant cannot show that this term requires construction or that it should be limited to requiring maintenance of information about a mobile device's current location.

### 19.    "wireless access point" (claims 5, 6, 14)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "device that communicates a wireless protocol signal wirelessly" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 5. However, as discussed above regarding the term "wireless", the '330 Patent shows,

such as in Fig. 1, that "wireless access points" can send and receive signals via wires, and do not always exclusively send and receive signals wirelessly. Indeed, the specification states:

> For example, by increasing the amount of attenuation provided by an attenuator 145, the power delivered from a **wireless access point** 130 to an attached antenna 140 for transmission as well as the power of a signal received by an antenna 140 that is delivered to the **wireless access point** 130 can be reduced. Decreasing the amount of attenuation allows the **wireless access point** 130 to deliver increased power to an attached antenna 140 for transmission as well as receive higher power signals from the attached antenna 140. '330 Patent (5:17-25) (emphasis added).

This passage expressly describes "wireless access points" communicating both wired (i.e. "to an attached antenna") and wirelessly. Thus, the intrinsic evidence does not support Defendants' proposed construction that "wireless access points" must communicate exclusively wirelessly.

### 20.    "attenuator"/"attenuation" (claims 5-8, 14, 17-19)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a device that can increase or decrease the level of a signal" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 8. However, "attenuation" cannot increase the level of a signal. Hernandez at 15. While it is tyre that, "[a]n attenuator is a device that increases and decreases signal power from a source," "[a]ttenuation is the process of decreasing the power of a signal, independent of the transmission power, by applying a certain amount of offset dB or decibels to 'attenuate' the signal." *Id*.

### 21.    "antenna" (claims 5, 10, 14)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "an electrical device that radiates electromagnetic waves wirelessly" |

This term was construed in Motorola to have the meaning Defendants propose here. *Motorola* at 8. However, radiating electromagnetic waves wirelessly is only one function of an

antenna, as they can also sense electromagnetic waves. Hernandez at 16. The '330 Patent provides

exactly such a description of antenna in the specification:

> Each access point 130 can be a wireless access point having an antenna 140. Each antenna 140 can be an omni directional antenna so as to model base station signal **transmission and reception** behavior. '330 Patent (4:62-65) (emphasis added)

The intrinsic evidence adopts the plain and ordinary meaning of antenna, which includes sensing

or receiving signals, which Defendants' proposed construction does not include.

### 22. "variable attenuator comprises a plurality of variable attenuators" (claim 7)

| Mobility's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term has not been previously construed. The specification states:

> Each wireless node 105 also can include an attenuator 145 disposed between each wireless access point 130 and antenna 140. **The attenuators 145 can be implemented as a variable or programmable attenuator for use with antennas.** Each attenuator 145 can receive control signals allowing the amount of attenuation provided by that attenuator 145 to be controlled dynamically from another device. '330 Patent (5:5-13) (emphasis added).

As this passage shows, the concept of a variable attenuator having multiple variable attenuators

was expressly taught by the '330 Patent. This possible arrangement of a variable attenuator is what

one of skill in the art would have understood this phrase to mean at the time of the invention.

Hernandez at 16-17. Defendants cannot prove with clear and convincing evidence that this phrase

fails to inform one of skill in the art of the scope of the invention.

## IV.    CONCLUSION

For the foregoing reasons, the Court should adopt Mobility's positions and proposed

constructions and reject those of Defendants.

Dated: March 19, 2024

Respectfully Submitted,

/s/ Daniel B. Ravicher

Michael Machat (CA Bar No. 109475)
MACHAT & ASSOCIATES, PC
8730 W. Sunset Blvd., Ste. 250
West Hollywood, CA 90069
Telephone: (310) 860-1833
Email: michael@machatlaw.com

Daniel B. Ravicher (FL Bar No. 102809)
ZEISLER PLLC
777 Brickell Ave Fl 5
Miami, FL 33131
Telephone: (786) 505-1205
Email: dan@zeisler-law.com

*Counsel for Plaintiff Mobility Workx, LLC*

## CERTIFICATE OF SERVICE

I certify this document is being served on counsel of record on the date listed above via the

ECF filing system.

/s/ *Daniel B. Ravicher*
Daniel B. Ravicher