## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| MOBILITY WORKX, LLC., | 4:23-cv-00594-ALM |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| v. | |
| AT&T INC., AT&T CORP., AT&T COMMUNICATIONS LLC, AT&T MOBILITY LLC, and AT&T SERVICES INC., | |
| *Defendants*. | |

## AT&T'S RESPONSIVE
## <u>CLAIM CONSTRUCTION BRIEF</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................... 1

II.     BACKGROUND ................................................................................ 2

    A.      FACTUAL BACKGROUND ...................................................... 2

    B.      PROCEDURAL BACKGROUND .................................................5

III.    MOBILITY IS JUDICIALLY ESTOPPED FROM ADVANCING NEW CONSTRUCTIONS FOR SEVERAL TERMS ................................... 8

IV.     THE '508 AND '417 PATENT TERMS ............................................. 9

    1.  "a ghost mobile node" ('508 claims 7, 8, 11-15; '417 claims 1, 3, 6) ...........9

    2.  "the ghost foreign agent" ('508 claim 14; '417 claims 1, 6) ......................10

    3.  "geographical current state" ('508 claims 7, 14) ............................................11

    4.  "predicted geographical future state(s)" ('508 claims 7, 14).....................13

    5.  "correspondent node" ('508 claims 11, 17) .................................................13

    6.  "when the mobile node is located in a geographical area where the foreign agent is not physical present" ('417 claim 1)...................................13

    7.  "tunnel" ('417 claim 3) .................................................................................13

    8.  "wherein signaling further comprises at least one of a tunnel and a communication network" ('417 claim 3).....................................................15

    9.  "care-of address" ('417 claim 6)....................................................................16

    10. "mobile IP advertisement messages" ('417 claim 6)...................................17

V.      THE '330 PATENT .......................................................................... 18

    1.  "wireless" (claims 1–19)................................................................................18

    2.  "wireless network nodes"/"wireless nodes" (claims 1, 2, 5, 9, 11, 14–16) .................................................................................................................20

    3.  "emulator" (claims 1, 2, 5, 11, 16)................................................................21

    4.  "emulating"/"emulate"/"emulated"/"emulates" (claims 1, 2, 8, 11, 17, 19) ...........................................................................................................22

    5.  "mobile node configured to wirelessly communicate"/"mobile node wirelessly communicates" (claims 1, 11) ....................................................22

    6.  "a packet-based wired communications network" (claims 1, 11).................23

    7.  "wireless communication conditions" (claims 1, 11) ...................................24

    8.  "home agent" (claims 2, 11, 16) ...................................................................25

    9.  "wireless access point" (claims 5, 6, 14) .....................................................26

10. "attenuator"/"attenuating" (claims 5–8, 14, 17–19) ....................................27

11. "antenna" (claims 5, 10, 14) ........................................................................28

12. "variable attenuator comprises a plurality of variable attenuators"
(claim 7) ..........................................................................................................28

VI.    CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*CIAS, Inc. v. Alliance Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007).................................................................................16

*Intercept Pharms., Inc. v. Apotex Inc.*,
   C.A. No. 20-1105, 2022 U.S. Dist. LEXIS 51961 (D. Del. Mar. 23,
   2022) ........................................................................................................................14

*Love v. Tyson Foods, Inc.*,
   677 F.3d 258 (5th Cir. 2012) ......................................................................................8

*Lucent Techs., Inc. v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008)................................................................................30

*Mobility Workx, LLC v. Cellco P'ship d/b/a Verizon Wireless et al.*,
   No. 4:17-cv-872-ALM (E.D. Tex.)...................................................................... *passim*

*Mobility Workx, LLC v. T-Mobile US, Inc., et al.*,
   No. 4:17-cv-567-ALM (E.D. Tex.)...................................................................... *passim*

*Novo Nordisk A/S v. Bio-Tech. Gen. Corp., Ltd.*,
   No. Civ.A 02-332-SLR, 2003 U.S. Dist. LEXIS 10098, 2003 WL
   21383717 (D. Del. June 9, 2003) ................................................................................8

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
   987 F.3d 1368 (Fed. Cir. 2021)................................................................................29

*Trustees of Columbia University in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016)................................................................................29

*University of Fla. Res. Found. Inc. et al. v. Motorola Mobility, LLC*,
   No. 13-cv-61120-KMM (S.D. Fla.).................................................................... *passim*

**Statutes**

35 U.S.C. § 112, ¶ 6 ........................................................................................................7

**TABLE OF EXHIBITS**

|   | Description |
|---|---|
| A | U.S. Patent No. 7,697,508 |
| B | U.S. Patent No. 8,213,417 |
| C | U.S. Patent No. 7,231,330 |
| D | Order on Claim Construction, *Univ. of Fla. Res. Found. v. Motorola Mobility LLC*, No. 13-cv-61120-KMM (S.D. Fla. Feb. 19, 2014) (Dkt. 94) |
| E | Claim Construction Memorandum Opinion and Order, *Mobility Workx, LLC v. T-Mobile US, Inc., et al.*, No. 4:17-cv-567 (E.D. Tex. July 31, 2018) (Dkt. 48) |
| F | Claim Construction Memorandum Opinion and Order, *Mobility Workx, LLC v. Cellco P'ship d/b/a Verizon Wireless et al.*, No. 4:17-cv-872 (E.D. Tex. Mar. 15, 2019) (Dkt. 74) |
| G | Excerpts of the file history for U.S. Patent No. 7,697,508 |
| H | Exhibit A: Plaintiffs' Proposed Construction of Disputed Terms & Supporting Evidence, *Univ. of Fla. Res. Found. v. Motorola Mobility LLC*, No. 13-cv-61120-KMM (S.D. Fla. Sept. 20, 2013) (Dkt. 35) |
| I | Joint Supplemental Statement on Patent Claim Constructions, *Univ. of Fla. Res. Found. v. Motorola Mobility LLC*, No. 13-cv-61120-KMM (S.D. Fla. Oct. 7, 2013) (Dkt. 44) |
| J | C. Perkins, RFC 2002, *IP Mobility Support* (Oct. 1996) |
| K | Kivisaari, "A Comparison Between Mobile IPv4 and Mobile IPv6", *Proceedings of the Helsinki University of Technology, Seminar on Internetworking - Ad Hoc Networks*, Spring 2000, http://www.cse.tkk.fi/fi/opinnot/T-110.5190/2000/comparison_IPv4_IPv6/internetworking_seminar.html |
| L | D. Johnson et al., RFC 3775, *Mobility Support in IPv6* (June 2004) |
| M | Joint Claim Construction Chart Pursuant to P.R. 4-5(d), *Mobility Workx, LLC v. Cellco P'ship d/b/a Verizon Wireless et al.*, No. 4:17-cv-872 (E.D. Tex. Feb. 25, 2019) (Dkt. 68) |
| N | Exhibit A, Joint Claim Construction Chart, *Mobility Workx, LLC v. T-Mobile US, Inc., et al.*, No. 4:17-cv-567 (E.D. Tex. July 2, 2018) (Dkt. 38-1) |
| O | Declaration of James Proctor, M.S.E.E. ("Proctor Dec.") |
| O-1 | Curriculum Vitae of James A. Proctor |
| P | Sauter, UMTS Hard Handover, "From GSM to LTE-Advanced" (2014) |
| Q | Rappaport, Wireless Communications: Principles and Practice (1996) |
| R | Fujimoto, Network Simulation (2007) |

## I.    INTRODUCTION

Mobility Workx LLC ("Mobility") asserts three patents against AT&T Corp., AT&T Mobility LLC, and AT&T Services Inc. (collectively, "AT&T"): U.S. Patent Nos. 8,213,417 ("the '417 Patent"), 7,697,508 ("the '508 Patent"), and 7,231,330 ("the '330 Patent") (collectively, the "patents-in-suit").

The '417 and '508 Patents share a common specification and disclose a method to minimize both delay and information loss that may occur when a mobile device (also referred to as a "mobile node") moves from one network to another. Ex. B at 2:20-38.[1] According to the '417 and '508 Patents, in "conventional systems," the process of setting up a connection on the target network could not begin until the mobile node arrived in the predefined region of coverage of the target network. In contrast to these "conventional systems," the '417 and '508 Patents propose a proactive and predictive solution using so-called "ghost" entities that perform the registration process on behalf of the mobile node *before* it arrives in the coverage area of the target network (also referred to as the "foreign agent").

The '330 Patent relates to a network simulator designed to allow the wireless testing of mobile devices. According to the '330 Patent, conventional wire-line emulators that existed at that time were not able to accurately model mobile networks, because they could not "account for characteristics of rapid mobility networks or complex signal propagation models." Ex. C at 2:10-14. The '330 Patent attempts to solve this problem by simulating movement of the mobile node by attenuating the signals transmitted and received between the mobile node and the "wireless network node," or base station. Ex. C at 2:19-23.

---

[1] For convenience, citations to common portions of the '417 and '508 Patents will be to the '417 Patent only.

AT&T's constructions provide guidance as to how a person of ordinary skill in the art would have understood the disputed terms of the patents-in-suit. In contrast, Mobility advocates for a "plain and ordinary meaning" of many of the claim terms, but its briefing reveals that what Mobility considers to be the "plain and ordinary meaning" is often at odds with the specification of the patents as well as its prior positions and this Court's prior claim construction orders.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The '417 and '508 Patents

By July 2003, numerous 2G, 2.5G and 3G cellular networks had been standardized and implemented throughout the world, including GSM (2G), GPRS (2.5G), CDMA (2G and 3G), and UMTS (3G) cellular networks. The coverage area of a typical base station in conventional cellular networks was relatively large (approximately 1.5 km or more in diameter) compared to the coverage area of a typical Wi-Fi access point (on the order of 100 m outdoors and 20 m indoors). Moreover, the time to complete a link layer handover from one base station to another in the same cellular network was 200 ms (milliseconds) or less. Thus, within a particular cellular network, the set-up time (or handover time) was much smaller than the typical "dwell time" in a cell—meaning the time that a mobile device spends in the coverage area of a base station as it moves through the network. For example, even at 200 km/h (~124 mph), the dwell time in a 1.5 km cell would be 27 seconds. Proctor Dec., ¶ 38.

Because the handover times were short, there were no issues in conventional cellular systems when registering a mobile node to a new base station and resources were allocated reactively. That is, a mobile node took actual measurements of the signals it directly received from the base stations in the current and neighboring cells and reported the measurements to the cellular network. Thereafter, the cellular network equipment made a handover decision and initiated a

handover on behalf of the mobile node based in part on "reacting" to such measurements. These systems did not proactively predict a future location of the mobile node and did not (and could not) register a mobile node to a neighboring cell when the mobile node was outside the coverage area of the cell. That remains true today.

In the cellular handover procedures used in the prior art cellular networks to the '417 and '508 Patents, the mobile node would determine whether the received signals within the current and neighboring cells were strong enough to maintain a call or data connection, and whether any neighboring cell's signal was stronger than the current cell's signal by a specified amount. It could do this because cell coverages overlapped. Thus, the mobile node would be perceiving the coverage from each cell with a different signal strength. If a neighboring cell signal was strong enough to make a connection and sufficiently better than the current cell signal, a handover would take place, assuming there was capacity on the new cell to handle the new connection. Moreover, when that handover did occur in the prior art cellular networks, the mobile node would not need to change its IP address, nor would the data need to be routed through the network node serving the prior location of the mobile device. The prior art cellular networks were different in this regard than the internet protocols that existed at the time of the '417 and '508 Patents, such as the Internet Protocol version 4 ("IPv4"). "Mobile IPv4," which was in existence when the asserted patents were filed, provided a mechanism for mobility within the framework of an IPv4 system. Mobile Ipv4 operates by setting up the analog of a mail forwarding system, which presents significant challenges for "real-time" mobility such as handing over from one wireless access point to another while in a fast-moving vehicle. Proctor Dec., ¶ 31.

In contrast to the *reactive* handoff procedure used in the prior art cellular networks, the '417 and '508 Patents propose a *proactive* and *predictive* solution using so-called "ghost" entities

that perform the registration process on behalf of the mobile node ***before*** it arrives in the coverage region of the target network (also referred to as the "foreign agent"). There appears to be no dispute in this respect; Mobility's technology tutorial repeatedly states that the proactive and predictive nature of its claims—meaning the ability to pre-register the mobile device before it arrives in the target cell's coverage area—is the hallmark feature of its invention. That aspect of the claimed invention pervades the proper constructions for many of the disputed terms. Proctor Dec., ¶ 41.

## 2.    The '330 Patent

Separate and unrelated to the '417 and '508 Patents, the '330 Patent attempts to solve the problem of accurately modeling rapid mobility networks by simulating movement of the mobile node through attenuation of the signals transmitted and received between the mobile node and the wireless network node. Ex. C at 2:19-23. Incident to simulating movement of the mobile node, the system of the '330 Patent is able to analyze and compare the strength of the signal received with the data throughput, and "[s]uch an analysis can reveal hand-off rates between the wireless nodes." Ex. C at 7:22-26; *see also* Ex. C at 9:22-25.

In other words, the '330 Patent is directed to a system for simulating a mobile node's movement from one coverage area to another to wirelessly test the hand-off rate and hand-off performance of the wireless network nodes. Movement of the mobile node through the coverage areas is simulated through attenuation of the wirelessly transmitted signals.

4

**B.      Procedural Background**

Several terms of the Asserted Patents have been construed previously in three separate cases: the *Motorola* Case[2], the *T-Mobile* Case[3], and the *Verizon* Case[4], with two of those three cases filed in this Court.

### 1.      The *Motorola* Case and Claim Construction Order

On May 16, 2013, University of Florida Research Foundation, Inc. and Rapid Mobile Technologies, Inc. (prior parties-in-interest to the Asserted Patents), filed a Complaint in the Southern District of Florida against Motorola asserting claims for infringement of the '330 Patent. *Motorola* Case at Dkt. 1.

On February 19, 2014, the Court in the *Motorola* Case entered a Claim Construction Order construing certain terms of '330 Patent. *Motorola* Case at Dkt. 94 (Ex. D, the "Motorola Order"). Specifically, the Court entered the following constructions pertinent to this brief:

| Term | Court's Construction |
|---|---|
| "wireless" ('330 Pat., all asserted claims) | "without wires or cables, and only through air or vacuum" |
| "mobile node configured to wirelessly communicate" / "mobile node wirelessly communicates" ('330 Pat., Cls. 1, 11, and 20) | "a device that sends and receives signals wirelessly" |
| "wireless access point" ('330 Pat., Cls. 5, 6, and 14) | "device that communicates a wireless protocol signal wirelessly" |
| "wireless network nodes" / "wireless nodes" ('330 Pat., all asserted claims) | "an element of a network that sends and receives signals wirelessly" |

---

[2] *University of Fla. Res. Found. Inc. et al. v. Motorola Mobility, LLC*, No. 13-cv-61120-KMM (S.D. Fla.) (the "*Motorola* Case"). In this case, the University of Florida was the patentee, but the patents were assigned to a company called Rapid Mobile Technologies, Inc., which was a party to the case. Just like Mobility, Rapid Mobile Technologies, Inc. was owned by Drs. Hernandez and Helal.

[3] *Mobility Workx, LLC v. T-Mobile US, Inc., et al.*, No. 4:17-cv-567-ALM (E.D. Tex.) (the "*T-Mobile* Case").

[4] *Mobility Workx, LLC v. Cellco P'ship d/b/a Verizon Wireless et al.*, No. 4:17-cv-872-ALM (E.D. Tex.) (the "*Verizon* Case").

| | |
|---|---|
| "a packet-based wired communications network" ('330 Pat., Cls. 1, 11, and 20) | "a communications network in which packets of data are transmitted through wires or cables" |
| "attenuator" / "attenuation" ('330 Pat., Cls. 5-8, 14, 17-19, 21) | "a device that can increase or decrease the level of a signal" |
| "antenna" ('330 Pat., Cls. 5, 10, 14) | "an electrical device that radiates electromagnetic waves wirelessly" |

Thereafter, the parties entered into a settlement agreement following Court-ordered mediation on May 28, 2014, and the case was dismissed. *Motorola* Case at Dkts. 158, 163.

### 2. The *T-Mobile* Case and Claim Construction Order

On August 14, 2017, Mobility Workx filed a Complaint in the Eastern District of Texas (Sherman Division) against T-Mobile asserting claims for infringement of the '508 and '417 Patents. *T-Mobile* Case at Dkt. 1.

On July 31, 2018, this Court entered a Claim Construction Order in the *T-Mobile* Case construing certain terms of '508 and '417 Patents. *T-Mobile* Case at Dkt. 48 (Ex. E, the "*T-Mobile* Order"). Specifically, the Court entered the following constructions pertinent to this brief:

| Term | Court's Construction |
|---|---|
| "ghost mobile node" ('508 Pat., Cls. 1, 2; '417 Pat., Cls. 1, 4, 7) | "a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent" |
| "foreign agent" ('508 Pat., Cls. 1, 5; '417 Pat., Cls. 1, 4, 7) | "a network node on a visited network that assists the mobile node in receiving communications" |
| "ghost-foreign agent" ('508 Pat., Cls., 1, 5; '417 Pat., Cl. 1) | "a virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" |
| "geographical current state" ('508 Pat., Cl. 1) | "coverage area of an agent through which the mobile node is linked to the network at its current location" |
| "[predicted] geographical future state(s)" ('508 Pat., Cl. 1) | "coverage area, within a wireless communications network, in which the mobile |

| | |
|---|---|
| | node is predicted to be able to be linked to the wireless communications network at a time in the future" |
| "when the mobile node is located in a geographical area where the foreign agent is not physically present" ('417 Pat., Cl. 1) | "when the mobile node is located outside of the region covered by the foreign agent" |

This Court also construed the term "means for registering said ghost mobile node or mobile node with the associated ghost foreign agent or foreign agent, while the mobile node remains in the geographical current state" from claim 1 of the '508 Patent as a means-plus-function term under 35 U.S.C. § 112, ¶ 6 lacking corresponding structure from the specification, thus rendering the term indefinite. *T-Mobile* Order (Ex. E) at 48.

Shortly after the Court issued the Claim Construction Order in the *T-Mobile* Case, the parties settled, and the case was dismissed. *T-Mobile* Case, Dkts. 67, 68.

### 3.    The *Verizon* Case and Claim Construction Order

Nearly concurrently with the *T-Mobile* Case, on December 19, 2017, Mobility Workx filed a Complaint in the Eastern District of Texas (Sherman Division) against Verizon asserting claims for infringement of the '508, '417, and '330 Patents. *Verizon* Case at Dkt. 1.

After the Claim Construction Order invaliding certain claims of the '508 Patent issued in the *T-Mobile* Case, the *Verizon* Case was limited to the '417 Patent and the '330 Patent. On March 15, 2019, this Court entered a Claim Construction Order in the *Verizon* Case construing certain terms of '417 and '330 Patents. *Verizon* Case at Dkt. 74 (Ex. F, the "*Verizon* Order"). Specifically, the Court entered the following constructions pertinent to this brief, in addition to certain constructions that were agreed-upon:

| Term | Court's Construction |
|---|---|
| "when the mobile node is located in a geographical area where the foreign agent is not physically present" ('417 Pat., Cl. 1) | "when the mobile node is located outside of the region covered by the foreign agent" |

The *Verizon* Case was poised to proceed to trial in late 2019 when the Patent Trial and Appeal Board issued an order invalidating the asserted claims of the '417 Patent. *Verizon* Case at Dkt. 191. That order was ultimately affirmed by the Federal Circuit. The *Verizon* Case thereafter was poised to proceed to trial on the '330 Patent alone. *Verizon* Case at Dkt. 203. Prior to trial, the Court issued orders on pending motions, and shortly thereafter, the parties settled, and the case was dismissed. *Verizon* Case at Dkts. 248, 249.

## III.    MOBILITY IS JUDICIALLY ESTOPPED FROM ADVANCING NEW CONSTRUCTIONS FOR SEVERAL TERMS

Mobility advances constructions for numerous terms that it previously submitted to this Court as agreed-upon constructions. Mobility is judicially estopped from arguing for new or modified constructions for these terms.

In a patent suit, judicial estoppel "is applied in accordance with the law of the regional circuit as opposed to Federal Circuit law." *Novo Nordisk A/S v. Bio-Tech. Gen. Corp., Ltd.*, No. Civ.A 02-332-SLR, 2003 U.S. Dist. LEXIS 10098, 2003 WL 21383717, at *2 (D. Del. June 9, 2003). "The doctrine of judicial estoppel . . . prevent[s] a party from asserting a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding." *Love v. Tyson Foods, Inc*., 677 F.3d 258, 261 (5th Cir. 2012). In determining whether to apply judicial estoppel, it is helpful to consider whether: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Id*.

For the following terms, Mobility now advances constructions that are different than the constructions it previously advocated for and convinced this Court to adopt:

- "a/the ghost mobile node" ('508 and '417 Patents)

- "the ghost foreign agent" ('508 and '417 Patents)

- "geographical current state" ('508 Patent)

- "wireless" ('330 Patent)

- "wireless network nodes"/"wireless nodes" ('330 Patent)

- "mobile node configured to wirelessly communicate"/"mobile node wirelessly communicates" ('330 Patent)

- "a packet-based wired communications network" ('330 Patent)

It is beyond dispute that, in the prior cases, Mobility represented to the Court that it agreed to the proposed constructions for each of these terms. *See Verizon* Case, Dkt. 68 (Ex. M, the "*Verizon* Case JCCC"); *T-Mobile* Case, Dkt. 38 (Ex. N, the "*T-Mobile* Case JCCC"). And, in this Court's prior claim construction orders, it indicated that it adopted these constructions based on the parties' representation that they were agreed-upon. *Verizon* Order (Ex. F) at 6; *T-Mobile* Order (Ex. E) at 21. Finally, there was nothing inadvertent about Mobility's prior positions; it affirmatively agreed—sometimes in multiple cases—that these terms should be given the constructions it now wishes to change. Mobility is judicially estopped from advancing these new and/or modified constructions, and the Court need not revisit its prior constructions for these terms in this case.

## IV.    THE '508 AND '417 PATENT TERMS

### 1.    "a ghost mobile node" ('508 claims 7, 8, 11-15; '417 claims 1, 3, 6)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| "a node, or a virtual node, that can operate on behalf of the mobile node" | "a node, or a virtual node, that can operate on behalf of the mobile node and that is capable of registering with a foreign agent and allocating resources for the mobile node before the mobile node arrives in the physical area covered by the foreign agent" |

This Court analyzed this term in detail in the *T-Mobile* Case and should adopt its prior reasoning and conclusion. Specifically, this Court concluded:

> Thus, on balance, the patentee definitively stated that "[t]he ghost mobile node is capable of registering and allocating communication resources before the mobile node physically arrives in a geographical state." (*Id.* (emphasis omitted); *see, e.g., Omega Eng'g*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent.")). This understanding is consistent with the above-reproduced disclosures, particularly in the Summary of the Invention.

*T-Mobile* Order (Ex. E) at 13. The Court was correct, which is why Mobility subsequently advocated for this construction in the *Verizon* Case. *Verizon* Order (Ex. F) at 6. Because the Court was correct—and because Mobility is judicially estopped—the Court should adopt its prior construction.

### 2.    "the ghost foreign agent" ('508 claim 14; '417 claims 1, 6)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| "a node, or a virtual node, corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" | "a virtual node corresponding to a foreign agent that can make a mobile node aware of the corresponding foreign agent's presence in a communication network proximate to the predicted future location of the mobile node" |

The Court analyzed this term in detail in the *T-Mobile* Case and should adopt its prior reasoning and conclusion. Specifically, the Court concluded:

> At first blush, this disclosure of how a ghost-foreign agent "can be configured" might be read as referring to merely one possible implementation. In context, however, this statement regarding the "present invention," which appears in the Summary of the Invention, amounts to a disclosure of what the ghost-foreign agent necessarily can do. In other words, in light of this context, the patentee set forth this functionality as a required capability. *See, e.g., VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term. . . . Statements that describe the

10

> invention as a whole are more likely to be found in certain sections of the
> specification, such as the Summary of the Invention.").

*T-Mobile* Order (Ex. E) at 19. The Court was correct, which is why Mobility subsequently

advocated for this construction in the *Verizon* Case. *Verizon* Order (Ex. F) at 6. Because the Court

was correct—and because Mobility is judicially estopped—the Court should adopt its prior

construction.

      **3.**      **"geographical current state" ('508 claims 7, 14)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "coverage area of an agent through which the mobile node is linked to the network at its current location" |

      This is Mobility's third proposed construction for this term, and is different than the

meaning it previously stipulated to and which the Court adopted based on that stipulation.

*Compare T-Mobile* Order (Ex. E) at pp. 20 (first construction), 21 (later-agreed construction) *with*

Brief at 4 (plain and ordinary construction). AT&T's construction is the same as the Court

previously adopted, and should be adopted in this case.

      Although Mobility's new claim construction position is "plain and ordinary meaning," it

only quibbles with the use of the phrase "coverage area" to explain "geographical…state" in the

Court's prior construction through the exclusive reliance on extrinsic evidence supplied by the

inventors. The inventors—who are also the principals of Mobility with a direct interest in the

outcome of this case—are mistaken.

      The specification does not use the term "geographical." This term was first introduced in

the amended claims of the Office Action Response dated April 6, 2009, where the applicants

stated:

> An estimated location of the mobile node based on GPS data can be utilized along
> with trajectory and speed information of the mobile node *to predict the future
> geographical state*. … The ghost mobile node is capable of registering and

> allocating communication resources *before* the mobile node physically arrives in a geographical state.

Ex. G (emphasis in the original). The concept of predicting future states is discussed in various portions of the specification. The specification consistently explains that the state of a given mobile is based upon the coverage area:

> "The future state can be a physical state such as the location of the mobile node 250, and the prediction can be the time that the mobile node will be in the **predefined region served by the foreign agent** 215." 508 Patent (Ex. A) at 6:39-43.[5]

> "With conventional systems and devices, the setting up typically must await the arrival of the mobile node in the **predefined region of coverage for the foreign agent** to which the mobile node is to be handed off." 508 Patent (Ex. A) at 2:29-33.

> "The ghost-foreign agent can thus make a mobile node aware of a corresponding foreign agents presence in a communication network before the mobile node actually arrives in the **physical region covered by the foreign agent**. Accordingly, the ghost-mobile node and the ghost-foreign agent, operating either individually or jointly, can cause network communication resources to be allocated preemptively rather than passively as in conventional communications networks in which handoffs typically only follow an exchange of setup information following a mobile node's arrival in the **physical region covered by the foreign agent**." 508 Patent (Ex. A) at 4:3-14.

*See also* Proctor Dec., ¶¶ 53-56.

Finally, Mobility previously proposed that the term "predicted geographical future state" should be construed to include "coverage area(s)" and that its construction "reflects the clear teaching of the specification." *T-Mobile* Order (Ex. E) at 22. Mobility's ***prior position*** is consistent with the specification, AT&T's current construction, and the Court's prior construction. The Court should adopt its prior construction for this term.

---

[5] All emphasis added unless otherwise noted.

4.      **"predicted geographical future state(s)" ('508 claims 7, 14)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "coverage area, within a wireless communications network, in which the mobile node is predicted to be able to be linked to the wireless communication network at a time in the future" |

Again, this is Mobility's third proposed construction for this term, *T-Mobile* Order (Ex. E) at 22, and Mobility's Brief does not offer any arguments distinct from its arguments for "geographical current state." For the reasons set forth above, and for the reasons set forth in this Court's previous Order (*T-Mobile* Order (Ex. E) at 22-25), the Court should adopt its prior construction for this term.

5.      **"correspondent node" ('508 claims 11, 17)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a node, other than the home agent, in a home network capable of receiving communications from other network nodes" |

AT&T agrees that this term should be given its plain and ordinary meaning, and thus, no dispute remains as to this term.

6.      **"when the mobile node is located in a geographical area where the foreign agent is not physical present" ('417 claim 1)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Same as Defendants | "when the mobile node is located outside of the region covered by the foreign agent" |

Mobility now agrees to AT&T's proposed construction (Brief at 6), and thus the Court should enter AT&T's proposed construction as an agreed-upon construction.

7.      **"tunnel" ('417 claim 3)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a data path for transmitting data intended for use only within a private network through a public network such that the public routing nodes are |

| | unaware that the transmission is part of a private network" |
|---|---|

The specification provides a very specific and explicit definition of this term that clarifies its use in the '417 Patent. AT&T proposes that the Court adopt the patentee's definition at the time they wrote the '417 Patent—not the competing definitions that they provide now in the context of litigation.

The specification clearly explains what a tunnel is and how it is used for tunneling:

> *As used herein, tunneling refers to the transmission of data intended for use only within a private, such as a corporate, network through a public network wherein the transmission is performed in such a way that the routing nodes in the public network are unaware that the transmission is part of a private network.* Tunneling is generally performed by encapsulating the private network data and protocol information within the public network transmission units so that the private network protocol information appears to the public network as data. Tunneling allows the use of the Internet, which is a public network, to convey data on behalf of a private network. Common examples of tunneling techniques can include, but are not limited to, Point-to-Point Tunneling Protocol (PPTP) and generic routing encapsulation (GRE). Still, any of a variety of different tunneling techniques can be used.

'508 Patent (Ex. A) at 5:55-6:2. The specification uses the explicit definition language "as used herein" to set off its *definition* of tunnels. *See ParkerVision, Inc. v.* Vidal, 88 F.4th 969, 976 (Fed. Cir. 2023) ("The patentee's use of the phrases 'as used herein' and 'refer to' conveys an intent for sentence 5 to be definitional."); *Intercept Pharms., Inc. v. Apotex Inc.*, C.A. No. 20-1105, 2022 U.S. Dist. LEXIS 51961, *11 (D. Del. Mar. 23, 2022) ("Moreover, the phrase 'as used herein' has been recognized as definitional in a wide host of Federal Circuit and district court cases."). That definition explains that tunnels are used to transmit private data over a public network such that the public nodes are unaware of the contents of the tunnel. That concept is captured in AT&T's proposed construction, using clear definitional language set forth in the specification.

Mobility criticizes AT&T's proposed construction by suggesting that it "comes from a different part of the specification that discusses the act of tunneling, not tunnels." Brief at 8. This

is not a credible distinction; there is no question that "tunneling" is accomplished with "tunnels," and Mobility does not suggest otherwise. Moreover, nothing in the intrinsic evidence cited by Mobility—which merely uses the word "tunnel(s)" following the definitional statement provided earlier in the specification—is in any way inconsistent with the definition provided in the specification and proposed by AT&T. Finally, the *ipse dixit* of Mobility's inventors/owners is unreliable extrinsic evidence that cannot overcome the definitional statements in the specification. AT&T's proposed construction should be adopted.

### 8. "wherein signaling further comprises at least one of a tunnel and a communication network" ('417 claim 3)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term is indefinite because it fails to inform one of ordinary skill in the art as to the scope of the invention. There are two issues for the Court to consider with this claim; one is solvable, the other is not.

The first question is how one of ordinary skill in the art would understand the phrase "at least one of a tunnel and a communication network": is it one of either or one of both? The Federal Circuit resolved this question. In *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, the Federal Circuit concluded that when "[t]he phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria…[the phrase] require[es] that the user select at least one value for each category." 358 F.3d 870, 886 (Fed. Cir. 2004). Applying this ruling to this term, the claim requires "wherein signaling further comprises at least one of a tunnel and at least one of a communication network." And although Mobility incorrectly casts this as a "typographical error," it appears that the parties are largely in agreement with this aspect of the disputed construction.

15

The second question, however, cannot be resolved: what does "wherein signaling further comprises . . . at least one of a communication network"? It is axiomatic that "[i]n the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'" *CIAS, Inc. v. Alliance Gaming Corp*., 504 F.3d 1356, 1360 (Fed. Cir. 2007). The claim would thus be understood to require "wherein signaling further includes but is not limited to . . . at least one of a communication network." The "signaling" referred to in this claim—claim 3 which depends on claim 1—is the "signaling required to allocate resources and initiate mobility on behalf of the mobile node" that is performed by the "ghost-mobile node" in claim 1. A person or ordinary skill in the art would not understand what it means for the "signaling required to allocate resources and initiate mobility on behalf of the mobile node" to "include but not be limited to . . . at least one of a communication network." Proctor Dec., ¶¶ 57-58. A "communication network" is not "signaling," it is a network over which signals may be transmitted. *Id.* Indeed, the remainder of claim 3 requires that the "signaling"—which must include at least one of a "communication network"—is "triggered at a threshold distance to one of the foreign agents." A person of ordinary skill in the art would not understand how a "communication network" could be a "signal" or how a "communication network" could be "triggered." *Id.* As a result, this claim is indefinite.

### 9.    "care-of address" ('417 claim 6)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "an IP address that changes as the mobile node moves between networks" |

The term "care-of address" has a generally understood meaning in a non-technical context; when a party mails a package to a "care-of address"—typically abbreviated as a "c/o" address—it means that the package is being sent to an addressee that is accepting the package on behalf of someone who only temporarily resides at that location. If the intended recipient moves again, the

"care-of address" will change as it moves from location to location. The usage of "care-of address" in the '417 Patent is similar, as it describes an "IP address that changes as the mobile node moves between networks," as AT&T proposes.

The specification explains what a "care-of address" is in the context of the '417 Patent:

> The **care-of address changes as the mobile node moves between networks thereby changing its point of attachment to a network**. When the mobile node links to a network other than one in which the home agent resides, the mobile node is said to have linked to a foreign network. The home network provides the mobile node with an IP address and once the node moves to a foreign network and establishes a point of attachment, **the mobile node receives a care-of address assigned by the foreign network**.

'417 Patent (Ex. B) at 1:47-56. The specification makes clear that, in the context of this patent, the "care-of address" is the temporary IP address where the mobile node can be reached as it moves into a foreign network. This concept is reflected in AT&T's proposed construction.

Mobility cites to two passages from the specification to argue that those passages do not require the care-of address to change as the mobile node moves between networks. Brief at 10. AT&T agrees that those two passage do not, by themselves, require this, but that is simply because they say almost nothing about what the "care-of address" is. In contrast, the portion of the specification that explains what a "care-of address" is—which is cited above and which forms the basis for AT&T's proposed construction—makes clear that it is an address that changes as the mobile node moves between networks. The Court should adopt AT&T's proposed construction.

### 10.    "mobile IP advertisement messages" ('417 claim 6)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term is indefinite because one of ordinary skill in the art would not understand what is meant by this phrase. The phrase "mobile IP advertisement message" does not appear anywhere in the specification, and has no regularly understood meaning to one of ordinary skill in the art. A

person of skill in the art is thus left to guess—without any guidance from the '417 Patent itself—as to what this term may mean. As such, the claim fails to inform a person of ordinary skill in the art what the patentee considers to be the scope of the invention, and it is invalid. Proctor Dec., ¶¶ 59-60.

Mobility's efforts to salvage the validity of this term only highlight its problems. Mobility states that "[t]he specification describes that an 'advertisement' is merely a 'message' that typically include IP addresses for foreign agents. This is also the plain and ordinary meaning of this phrase." Brief at 12. Mobility's explanation of the meaning of this term strips it of meaning; because Mobility does not suggest that the message must include "IP addresses for foreign agents," the plain and ordinary meaning Mobility ascribes to the phrase "mobile IP advertisement messages" is simply "messages." Mobility cannot preserve the validity of this vague and meaningless term by rewriting the claim to eliminate the problematic words. Mobility also cites to the declaration of Dr. Hernandez—the inventor and co-owner of Mobility—to suggest that "mobile IP advertisement messages corresponds to the ICMP Standard." Brief at 12 (internal quotes omitted). This statement is effectively meaningless; the "ICMP Standard" that Dr. Hernandez references is, according to Dr. Hernandez, the ICMP Router Discovery standard/specification. Hernandez Dec., ¶¶ 49-50. That document is not incorporated by reference into the '417 Patent, nor does Dr. Hernandez even offer it as an attachment. The Court can, and should, disregard Mobility's confusing efforts to explain away an indefinite claim term.

## V.    THE '330 PATENT

### 1.    "wireless" (claims 1–19)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "without wires or cables, and only through air or vacuum" |

The *Motorola* court analyzed this term in detail and adopted the same construction that AT&T proposes. *Motorola* Order (Ex. D) at 3-4. Moreover, Mobility agreed in the *Verizon* Case that the term "wireless" should be construed as "without wires or cables, and only through air or vacuum." *Verizon* Case JCCC (Ex. M) at 10. This Court adopted that construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction. *See Verizon* Order (Ex. F) at 7.

Setting that aside, however, it is beyond reasonable dispute that "wireless" means "without wires or cables, and only through air or vacuum." Proctor Dec., ¶¶ 61-62. Mobility does not seriously challenge this, but instead throws up straw man arguments and tries to walk back its prior construction. AT&T is not taking the position that a "wireless network" must not have any wires anywhere in the network, nor is it suggesting that a "wireless node" cannot connect to anything using wires. A "wireless network" is one where the connection between the mobile device and the network is "wireless," meaning without wires or cables, and only through air or vacuum. A "wireless node" is a node that communicates with a mobile device via a wireless interface, meaning without wires or cables, and only through air or vacuum. It strains credulity for Mobility to suggest that AT&T is going to argue that if there is a wire anywhere in a "wireless" network then there is no infringement. Brief at 13.

That notwithstanding, the Court should appreciate what Mobility is attempting to do: it wants to be able to argue that a "wireless" connection exists when the two elements are hardwired to one another. Mobility's "plain and ordinary meaning" is a "camel's nose" that is intended to allow it to argue that a wired connection is "wireless" because it uses a "wireless protocol." Mobility's brief previews this when it argues that "a 'wireless' signal is merely one with a particular radio frequency and can be emulated in a wired system." Brief at 14. In other words,

Mobility's understanding of the "plain and ordinary" meaning of wireless sweeps **wired** connections into the literal meaning of "**wireless**." It is inconceivable that the plain and ordinary meaning of a word can encompass its antonym. The Court should adopt the construction that AT&T—and previously Mobility—advocates.

2.  **"wireless network nodes"/"wireless nodes" (claims 1, 2, 5, 9, 11, 14–16)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| "an element of a wireless network that sends and receives signals" | "an element of a network that sends and receives signals wirelessly" |

The *Motorola* court analyzed this term in detail and adopted the same construction that AT&T proposes. *Motorola* Order (Ex. D) at 5-6. In addition, Mobility agreed in the *Verizon* Case that the term should be given the construction that AT&T proposes. *Verizon* Case JCCC (Ex. M) at 11. This Court adopted that construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction. *See Verizon* Order (Ex. F) at 7.

The term "wireless network node" does not appear in the specification of the '330 Patent, but the term "wireless nodes" does. Both parties agree that these terms should be given the same construction, and the parties further agree that "node" means "an element of a network that sends and receives signals." The only dispute is what "wireless" modifies. The specification makes it abundantly clear that the "wireless nodes" wirelessly communicate with the mobile nodes. *See* '330 Patent (Ex. C) at 3:10-18 ("…while the mobile node wirelessly communicates with at least one of the wireless nodes"), 22-24 ("…each of the wireless nodes can include a wireless access point having an antenna and a variable attenuator"), 4:33-37 ("It will be readily appreciated by those of ordinary skill in the art that the mobile nodes 125 can be implemented as any suitable computing device having a wireless transceiver capable of communicating wirelessly with the wireless nodes 105."). The only logical reading of the term in the context of the specification is

that "wireless" modifies "node." Thus, the only proposed construction that is consistent across both terms—which both parties agree should be given the same construction—is "an element of a network that sends and receives signals wirelessly."

Mobility's proposed construction is, consistent with its proposed construction for "wireless," an attempt to expand the scope of this term far beyond the meaning ascribed to it in the specification. Mobility's proposed construction would result in a "wireless node" encompassing **any** "element" in a wireless network that sends and receives signals. Under this interpretation, Mobility would be able to point to virtually everything in a "wireless network" as being a "wireless node." Mobility's proposed construction is overbroad and should be rejected.

### 3.    "emulator" (claims 1, 2, 5, 11, 16)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a system or device (either hardware, software, or both) that imitates, models or simulates the conditions, acts or functions of a real-world event, system device, or condition" |

An emulator, in the context of the '330 Patent, is "a system or device (either hardware, software, or both) that imitates, models or simulates the conditions, acts or functions of a real-world event, system device, or condition." *See Motorola* JCCS (Ex. I) at 1.

Mobility's statements in its Brief confirms the accuracy of AT&T's proposed construction. Mobility agrees that an emulator can be either hardware or software. Brief at 15. It agrees that it emulates the conditions of a real-world, wired communication network. *Id.* In fact, Mobility does not seem to challenge any aspect of the substance of AT&T's proposed construction, and instead just suggests that the Court need not provide a specific construction. AT&T respectfully disagrees. The claims of the '330 Patent recite both a component required "to simulate" certain attributes and

an "emulator." AT&T believes that, in the absence of a substantive dispute regarding its construction, the jury would benefit from clarification by the Court on the meaning of "emulator."

    **4.**    **"emulating"/"emulate"/"emulated"/"emulates" (claims 1, 2, 8, 11, 17, 19)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "the act of imitating, modeling or simulating the conditions, acts or functions of a real-world event, system, device, or condition" |

AT&T submits that the proposed construction of these terms is tied to the Court's construction of "emulator," and should rise-or-fall with that term. *See Motorola* JCCS (Ex. I) at 1.

    **5.**    **"mobile node configured to wirelessly communicate"/"mobile node wirelessly communicates" (claims 1, 11)**

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| "a device that can send and receive wireless signals" | "a device that sends and receives signals wirelessly" |

The *Motorola* court analyzed this term in detail and adopted the same construction that AT&T proposes. *Motorola* Order (Ex. D) at 5. In addition, Mobility agreed in the *Verizon* Case that the term should be given the construction that AT&T proposes. *Verizon* Case JCCC (Ex. M) at 10. This Court adopted that construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction. *See Verizon* Order (Ex. F) at 7.

Nonetheless, AT&T's proposed construction reflects that plain and ordinary understanding of what it means to "wirelessly communicate." Namely, for the reasons addressed above with respect to the term "wireless," a person of ordinary skill would readily understand that wirelessly communicating means communicating without wires or cables, and only through air or a vacuum. Proctor Dec., ¶¶ 63-66. In numerous instances, the specification makes clear that the wireless communication is between a mobile node and the one or more wireless nodes. *See, e.g.*, '330 Patent (Ex. C) at 2:23-25 ("According to one embodiment of the present invention, a mobile node can be

configured to wirelessly communicate with an application via one or more wireless nodes."), 3:13-

14 ("…while the mobile node wirelessly communicates with at least one of the wireless nodes…").

Figure 1 confirms that the communication between the mobile node and the wireless network node

is wireless:



There is no support for Mobility's proposed construction, which attempts to open the door

to wired communications being wireless communications. Specifically, by moving the term

"wireless" to modify the signals as opposed to how they are sent and received, Mobility is

attempting to argue that a signal that uses a "wireless format"—even if sent over wires—is a

"wireless signal." This is antithetical to the plain and ordinary meaning of "wireless

communication," and should be rejected in favor of AT&T's proposed construction.

### 6.    "a packet-based wired communications network" (claims 1, 11)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| "a communications network in which IP packets of data are transmitted through wires or cables" | "a communications network in which packets of data are transmitted through wires or cables" |

The *Motorola* court analyzed this term in detail and adopted the same construction that

AT&T proposes. *Motorola* Order (Ex. D) at 6-7. In addition, Mobility agreed in the *Verizon* Case

that the term should be given the construction that AT&T proposes. *Verizon* Case JCCC (Ex. M)

at 11. This Court adopted that construction on the basis of Mobility's representation, thus Mobility is judicially estopped from advocating for a different construction. *See Verizon* Order (Ex. F) at 7.

The only disagreement between the parties on this term is whether the packets must be "IP packets"; AT&T's proposed construction is agnostic, whereas Mobility seeks to narrow the packets to only "IP packets." Mobility does not identify a single piece of intrinsic evidence that supports limiting the packets to "IP packets." It cites to one passage of the '330 Patent, but that passage does not contain or reference the word "packet," nor does it support the conclusion that the "packets" of the "packet-based wired communications network" must specifically be "IP packets." The Court should decline Mobility's request to narrow the agreed upon portion of the parties' construction, and should adopt AT&T's proposed construction.

### 7. "wireless communication conditions" (claims 1, 11)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The phrase "wireless communication conditions" does not appear in the specification of the '330 Patent, and there is nothing in the intrinsic evidence that sheds any light on what the "wireless communication conditions" are and how, if at all, they differ from the claimed "wireless communication characteristics." A person of ordinary skill in the art is left to guess at what might constitute a "wireless communication condition" and how controlling "wireless communication characteristics" might "simulate" those conditions. Proctor Dec., ¶¶ 67-70. Without any guidance or explanation from the specification, the patent fails to inform a person of ordinary skill in the art what the patentee considers to be the scope of the invention, and it is invalid. *Id.* at ¶ 70.

Mobility's efforts to save the validity of the claims actually highlights the problem. Mobility cites to column 6, lines 59-65, and emphasizes certain language, but that language sheds no light on what the "wireless communication conditions" might be. Mobility emphasizes

"conditions," but that is discussing the actions of the "emulator," which is not associated with the "wireless communication conditions" in the claims. Instead, it is the "controller" that "simulates…different wireless communication conditions." *See* Claim 1. Mobility also emphasizes language about emulation of the ***movement*** of the mobile node, but claims 1 and 11 make clear that the "wireless communication conditions" are what is "experienced by said at least one mobile node." "[T]rajectory, speed, and/or acceleration of a mobile node" relate to movement of a mobile node, not "wireless communication conditions." Mobility cannot point to anything in the specification that would clearly explain to a person of ordinary what this phrase means, thus the claim is indefinite.

### 8.    "home agent" (claims 2, 11, 16)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a device (or program) that maintains information about a mobile device's current location" |

AT&T proposes the agreed construction for "home agent" from the *Motorola* Case. The specification of the '330 Patent explains that the claimed "home agent" comprises a device or program that communicates with the mobile node. For example, the specification provides that a "home agent" "can be a computing environment with which the mobile node 125 can communicate via the wireless and wired portions of system 100" or that the "home agent" may comprise "one or more application programs which the mobile node 125 can access, a virtual private network (VPN) configuration, virtual environment, or the like." '330 Patent at 6:3-9; *see also id.* at Fig. 2.

The parties agreed in the *Motorola* Case that the term would be understood by a person of ordinary skill in the art to be limited to a device or program that specifically maintains information about a mobile device's current location. *See Motorola* Case at Dkt. 35 at 34 (Ex. H); *id.* at Dkt. 44 (Ex. I). For example, the plaintiff in the *Motorola* Case cited an industry definition for "home

agent" as providing: "In Mobile Internet Protocol (Mobile IP), ***a home agent is a router on a mobile node's home network that maintains information about the device's current location, as identified in its care-of address***." *Motorola* Case, Dkt. 35 (Ex. H) at 34 (emphasis in original). Similarly, the plaintiff also cited certain Network Working Group Requests for Comments as providing that a "home agent" is "[a] router on a mobile node's home network which tunnels datagrams for delivery to the mobile node when it is away from home, and ***maintains current location*** information for the mobile node." *Id.* (emphasis in original).

A person of ordinary skill in the art would understand the term pursuant to the definitions provided by Mobility's predecessor-in-interest, and the same construction that was agreed previously should be entered here.

### 9. "wireless access point" (claims 5, 6, 14)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "device that communicates a wireless protocol signal wirelessly" |

The dispute for this term focuses on whether a "wireless access point" must only communicate wirelessly. This is the same straw man argument that Mobility raised regarding the term "wireless." AT&T is not advocating that a "wireless access point" cannot have ***any*** wires, but rather that it is something that is configured to communicate wirelessly. The portions of the specification that Mobility cites confirms that the communications between a "wireless access point" and a mobile device is over the air through an antenna. Brief at 20. Mobility's deliberately obtuse read of AT&T's construction is not a reason to strip the term "wireless access point" of the word "wireless," and AT&T's proposed construction should be adopted.

### 10.    "attenuator"/"attenuating" (claims 5–8, 14, 17–19)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a device that can increase or decrease the level of a signal" |

AT&T's proposed construction is consistent with the specification and provides specificity that will assist the fact finder in evaluating the case. For example, the specification of the '330 Patent provides:

> The controller can be configured to dynamically adjust the wireless communication characteristics of one or more of the wireless access points by varying an amount of attenuation provided by the attenuators to simulate motion of one or more of the mobile nodes. For example, *attenuation provided by at least one of the attenuators can be increased while simultaneously decreasing attenuation provided by another one of the attenuators*. The controller can dynamically adjust the amount of attenuation provided by at least two of the attenuators to emulate at least one mobile network characteristic such as speed, acceleration, and/or trajectory of the mobile node.

'330 Patent (Ex. C) at 2:59-3:3. The specification also makes it clear that the attenuation provided by an attenuator can be increased or decreased:

> For example, by *increasing the amount of attenuation provided by an attenuator* 145, the power delivered from a wireless access point 130 to an attached antenna 140 for transmission as well as the power of a signal received by an antenna 140 that is delivered to the wireless access point 130 can be reduced. *Decreasing the amount of attenuation* allows the wireless access point 130 to deliver increased power to an attached antenna 140 for transmission as well as receive higher power signals from the attached antenna 140.

*Id.* at 5:17-25. Thus, AT&T's proposed construction accurately reflects the express disclosures of the '330 Patent that the attenuators may increase or decrease the level of a signal.

Mobility's response to this is, at best, confusing. It states that "'attenuation' cannot increase the level of a signal" right before it states that "[w]hile it is trye [*sic*] that, '[a]n attenuator is a device that increases and decreases signal power from a source'." Regardless, the specification makes clear that the claimed attenuator can increase and decrease the level of a signal by changing the attenuation level, which is consistent with AT&T's proposed construction.

### 11. "antenna" (claims 5, 10, 14)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "an electrical device that radiates electromagnetic waves wirelessly" |

Mobility's only dispute with respect to this term appears to be its assertion that an "antenna" can radiate **and** sense electromagnetic waves. Brief at 20-21. AT&T can agree to modify its construction of "antenna" to be "an electrical device that radiates and senses electromagnetic waves wirelessly." With that modification, it appears that the parties are in agreement on the construction of this term.

### 12. "variable attenuator comprises a plurality of variable attenuators" (claim 7)

| Mobility's Proposed Construction | AT&T's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term fails to inform one of ordinary skill of the scope of the claims, and is thus invalid. The dispute with respect to this term is not whether the specification discloses the use of multiple attenuators in the claimed system: it does. But what the specification does **not** disclose, and what makes no sense, is what it means for a "variable attenuator" to "comprise[] a plurality of variable attenuators." If the patentee wanted to simply claim a system with more than one variable attenuator, the way to do that would have been to draft a claim that read "The system of claim 6, wherein the system comprises a plurality of variable attenuators." This is not what happened, however. Instead, the patentee elected to require that the "*variable attenuator* comprises a plurality of variable attenuators."

The claim, as drafted makes no sense; it is illogical that a piece of hardware such as an attenuator can be made up of multiple attenuators. Proctor Dec., ¶¶ 71-72. While there are technical situations where this could be conceivable—such as a composite electromagnetic wave that is made up of multiple component waves—it makes no sense in the context of attenuators. *Id.* As

such, one of ordinary skill in the art would not understand what the scope of the claim is. Proctor Dec., ¶ 73.

The Federal Circuit has previously held claims to be indefinite where the claims were internally inconsistent. *See, e.g.*, *Trustees of Columbia University in City of New York v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016) (holding claims indefinite because they nonsensically "describe[d] the step of extracting machine code instructions from something that does not have machine code instructions"); *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1368, 1366-67 (Fed. Cir. 2021) (holding claims indefinite where the claims required a *single* digital media file comprise a *directory* of digital media files). For example, in *Synchronoss*, the asserted claims required "generating a [single] digital media file" that itself simultaneously "compris[es] a directory of digital media files." 987 F.3d at 1366. The patentee contended that a POSITA "would read the specification and reasonably understand that the inventions 'mean that, in response to input from a user, a digital media file is generated as a second, updated version of the media data in the same format as the first version of the media data.'" *Id.* The Federal Circuit held that "the asserted claims of the '466 Patent are nonsensical and require an impossibility – that the digital media file contain a directory of digital media files." *Id.* at 1366-67. The Federal Circuit also rejected the patentee's proposed reading of the claims, as the proposal "would [have] require[d] rewriting the claims" and "it is not [the Court's] function to rewrite the claims to preserve their validity." *Id.* at 1367 (internal quotations omitted, quoting *Allen v. Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002)).

This is not a term that can be "redrafted" in claim construction to resolve the indefiniteness issue. As noted by the Federal Circuit:

> This court has repeatedly held that ***courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their***

*validity*. *Chef Am., Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1373 (Fed. Cir. 2004); *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349 (Fed. Cir. 2002); *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1357 (Fed. Cir. 1999); *Quantum Corp. v. Rodime, PLC,* 65 F.3d 1577, 1584 (Fed. Cir. 1995); *Hoganas v. Dresser Indus., Inc.,* 9 F.3d 948, 951 (Fed. Cir. 1993). To do so "would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention." *Hoganas,* 9 F.3d at 951.

*Lucent Techs., Inc. v. Gateway, Inc*., 525 F.3d 1200, 1215 (Fed. Cir. 2008). There is no way to construe this term such that it is valid without redrafting the claim, which is impermissible. As such, the term and the claim are invalid.

## VI.    CONCLUSION

The Court should adopt AT&T's claim construction positions.

Dated: April 16, 2024

Respectfully submitted,

*/s/ Ross R. Barton*
Theodore Stevenson, III (TX Bar No. 19196650)
Darlena Subashi (NC Bar No. 53142)
ALSTON & BIRD LLP
Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone: (214) 922-3400
Facsimile: (214) 922-3899
Email: ted.stevenson@alson.com
Email: darlena.subashi@alston.com

Ross R. Barton (NC Bar No. 37179)
ALSTON & BIRD LLP
101 South Tyron Street, Suite 4000
Charlotte, North Carolina, 28280
Phone: (704) 444-1000
Facsimile: (704) 444-1111
Email: ross.barton@alston.com

David S. Frist (GA Bar No. 205611)
Shaleen J. Patel (GA Bar No. 295554)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900

Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: david.frist@alston.com
Email: shaleen.patel@alston.com

Wade Perrin (NY Bar No. 5346531)
ALSTON & BIRD LLP
90 Park Avenue 15th Floor
New York, NY 10016
Telephone: (212) (210-9400
Facsimile: (212) 210-9400
Email: wade.perrin@alston.com

*Attorneys for Defendants AT&T CORP., AT&T*
*MOBILITY LLC, AND AT&T SERVICES, INC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of April 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all counsel of record.

*/s/ Ross R. Barton*
Ross R. Barton